**In re METROPOLITAN ELECTRIC MANUFACTURING COMPANY, Debtor.**

No. 01–88103–478.

United States Bankruptcy Court, E.D. New York.

June 11, 2003.

Silverman Perlstein & Acampora, LLP, by Anthony C. Acampora, Jericho, NY, for Kenneth Silverman, Chapter 11 Operating Trustee.

Thaler & Gertler, LLP, by Andrew Thaler, Westbury, NY, for Broadway Equities, Metropolitan Switchboard Company, Inc., Louis Silvestre and Sharon Silvestre.

Pryor & Mandalupe, by Robert L. Pryor, Westbury, NY, for Joseph Shelley.

## MEMORANDUM DECISION

DOROTHY EISENBERG, Bankruptcy Judge.

The issue before the Court is whether a shareholder of Metropolitan Electric Man-ufacturing Company (the "Debtor") who filed two claims in this case may purchase from the Chapter 11 trustee an assignment of his rights to pursue certain avoidance claims against specific entities pursuant to 11 U.S.C. § 544(b) where the Chapter 11 trustee will not be taking any part in the litigation, and the benefit to the estate is limited to the purchase price. The Court has considered the facts of this case along with applicable case law, and concludes that the assignment of the Chapter 11 trustee's rights under this section of the Bankruptcy Code to the shareholder Joseph Shelley cannot be approved by this Court. The following constitutes the Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52 as made applicable by Fed. R. Bankr.P. 7052.

### Background and Facts

The Debtor is a closely-held corporation which engages in the manufacturing of electrical panel boards and equipment for the construction industry. The ownership of the Debtor was passed from Patrick Shelley as the one-time sole owner of the Debtor to two of his sons, James and Joseph Shelley, and subsequently to the descendants of James and Joseph Shelley. On November 2, 2001 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As of the Petition Date, the Debtor was owned 50% by Joseph Shelley, Kathryn M. Shelley, Mary Agnes Shelley and Mary Eileen Shelley Morrissey (the "Joseph Shelley Owners" or the "Joseph Shelley Group") and 50% by Sharon Silvestre, Michael Shelley and James Shelley, Jr. (the "James Shelley Owners" or the "James Shelley Group").

On September 7, 2000, as a result of several disputes between the James Shel-

ley Owners and the Joseph Shelley Owners, the Joseph Shelley Owners commenced an action in the Superior Court of New Jersey, Chancery Division, Mercer County seeking, *inter alia,* the judicial dissolution of the Debtor, or alternatively, the appointment of a receiver. By Order of the State Court, dated October 18, 2000, Albert Parziale was appointed as the Special Fiscal Agent. By letter dated September 17, 2001, Louis Silvestre, who had been the acting President and Chief Executive Officer of the Debtor, submitted his resignation. Mr. Silvestre is the spouse of a member of the James Shelley Group and has been the President and Chief Operating Officer for the past several years. Shortly thereafter, the Special Fiscal Agent convinced Mr. Silvestre to return as Chief Executive Officer and Acting President, and on October 4, 2001, the Chancery Court entered an order authorizing Mr. Parziale to consult with bankruptcy counsel regarding the filing of a petition in bankruptcy. On November 2, 2001 (the "Petition Date"), the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. The major cause for the filing of the Petition was that the two factions could not agree on even minor matters and the State Court Judge believed the Debtor would be better served in the Bankruptcy Court. As a result of the filing of the petition, all litigation pending against the Debtor was stayed. One of the actions pending as of the Petition Date was a shareholder derivative action commenced by the Joseph Shelley Owners against the James Shelley Owners and Broadway Equities to recover damages for a) breach of fiduciary duty, b) breach of duty of care, c) breach of loyalty, d) corporate mismanagement and e) for waste (the "Derivative Action").

After holding a hearing to determine whether Mr. Parziale should be appointed as Chief Restructuring Officer, and upon oral application by the Joseph Shelley Owners seeking the appointment of an Operating Trustee, the Court granted the oral application of the Joseph Shelley Owners. On December 13, 2001, Kenneth Silverman was appointed as the Chapter 11 Operating Trustee (the "Trustee"). Although the Court found no fault with Mr. Parziale and the work he performed on behalf of the Debtor prepetition and post petition, the appointment of an impartial third party who was a stranger to the prior proceedings between the Joseph Shelley Group and the James Shelley Group was appropriate given the level of acrimony between the two factions.

By order dated January 31, 2002, the Court authorized the Trustee to retain Parziale as the Chief Restructuring Officer of the Debtor and to retain J.H. Cohn as accountants for the Trustee. On April 19, 2003, the Trustee filed an Application to approve the sale of substantially all of the assets of the Debtor to Metropolitan Switchboard Co., Inc. ("Switchboard") subject to higher or better offers. Switchboard was formed by the James Shelley Group in order to acquire the saleable assets of the Debtor. The Trustee and Switchboard entered into an Asset Purchase Agreement dated April 15, 2002 (the "Asset Purchase Agreement"). Pursuant to sections 1(i) and (iv) of the Asset Purchase Agreement, the Trustee sought to sell to Switchboard, *inter alia,*

> (i) all of the Debtor's accounts receivable, notes receivable, refunds, rebates, claims and choses in action and any right of the Debtor to obtain money or other consideration, outstanding as of the Closing Date, and any guarantees related to, except specifically included in the Excluded Assets

and

(iv) all other assets of the Debtor and its bankruptcy estate, including the products and proceeds thereof, and the additions thereto, used in connection with the Business, other than the Excluded Assets.

Section 1(b)(v) of the Asset Purchase Agreement further states that the Excluded Assets include:

all of the rights and claims of Seller for avoidance actions available to Seller under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections, by operation of law or otherwise.

Thus, the sale specifically excluded the trustee's rights which are granted solely to the Trustee by the Bankruptcy Code. The assets were to be sold subject to any higher or better offer. The proposed purchase price for the assets being sold was $1.17 million plus waiver of claims that Broadway Equities may have against the Debtor's estate. Broadway Equities is an entity which is owned and controlled by the James Shelley Owners. Broadway Equities had filed a proof of claim against the Debtor in the secured amount of $3,029,408.86 for amounts forwarded to the Debtor on a line of credit. Although there was a dispute as to the value or allowable amount of this claim, there appeared to be supportable evidence as to a significant amount of the claim.

Joseph Shelley filed objections to the Asset Purchase Agreement, claiming that (i) the proposed purchaser was the alter ego of Louis Silvestre and the owners of the other 50% of the Debtor, who were using their "insider" position to thwart dissemination of accurate information regarding the Debtor's finances, and (ii) the purchase price was inadequate and the Trustee had failed to adequately market the assets to be sold.

After adjourning the hearing date to permit the Trustee to additionally advertise the proposed sale to ensure that proper notice of the proposed sale was given, the hearing on the Asset Purchase Agreement was held. At the adjourned hearing, Joseph Shelley was the only other bidder. After entertaining offers from both bidders, the Court concluded that the ultimate bid of Switchboard in the amount of $1.35 million and the withdrawal of Broadway Equities claim was the highest and best offer. An Order was entered approving the sale. The sale order was not appealed, and Mr. Silvestre has been operating the Debtor's business on behalf of the new owners utilizing Debtor's same employees and suppliers as before the sale.

Thereafter, by Order Shortening Notice dated February 13, 2003, the Trustee filed an application (the "Application") to sell to Joseph P. Shelley certain other claims, consisting of, *inter alia:* (i) all claims available to the trustee under Section 544(b) of the Bankruptcy Code, and (ii) all claims of the Debtor against certain entities pursuant to Bankr.Rule 6009 and 11 U.S.C. § 323 and all other enabling statutes provided to a Trustee pursuant to the bankruptcy statutes (collectively, the "Claims"). Although the initial offer included other assets, the Trustee withdrew any such offer prior to the final hearing date.

In the Application, the Trustee represented that after investigation by the Trustee and his counsel, the Claims "have minimal, if any, value." The purchase price offered for the Claims was set at $25,0000 plus ten percent of any sums recovered by Joseph Shelley from the prosecution or settlement of the Claims. The proposed sale of the Claims to Joseph

Shelley included a grant to Joseph Shelley of absolute discretion to decline to prosecute, settle, abandon or litigate each of the Claims. The Trustee was to retain no oversight authority regarding the Claims, and the Trustee would have no input regarding the decisions to settle, abandon or prosecute the Claims. This offer was an offer for the outright purchase of the Trustee's rights where the estate would receive the purchase price, but if there was any other recovery, it would belong to the offerors.

Switchboard filed objections to the Trustee's application, claiming, *inter alia,* that the proposed sale was violative of the Bankruptcy Code and applicable case law. At the hearing on the Application on March 13, 2003, the Court heard oral argument and directed the parties to file additional papers in order to clarify, *inter alia,* which claims were being offered for sale by the Trustee and the terms thereof, and specifically what the offeror wished to purchase.

At the adjourned hearing on April 29, 2003, the Trustee and Joseph Shelley indicated that the Trustee is seeking to sell trustee avoidance actions against certain entities that allegedly received prepetition transfers from the Debtor, which are allegedly subject to avoidance under Section 544 of the Bankruptcy Code. The entities listed include Louis Silvestre, Madeline Shelley, Sharon Silvestre and Broadway Equities, and certain trade creditors of the Debtor with whom the Debtor and now the new entity do business. Counsel to Joseph Shelley stated that Mr. Shelley relied on an analysis prepared by David Berdon, LLP of payments made by the Debtor from 1999 through 2001 (the "Berdon Report") and on information provided to him by Charles Shields, an accountant, in order to determine which transfers were "questionable." The Court notes that through-

out this lengthy case, Joseph Shelley Group never requested an order for a 2004 examination or other examination of any party that he would now seek to investigate.

At the adjourned hearing, counsel to Joseph Shelley also attempted to modify the offer by stating that Mr. Shelley would not object to operating in tandem with the Trustee in prosecuting the Claims, and that Mr. Shelley was willing to increase the percentage of recovery shared with other creditors of the Debtor to 20 %. The Trustee indicated that based on his investigations and analysis of the claims filed and the status of certain objections to claims he had brought, the estate was already in a position to receive an "excellent" recovery, which would be close to 100% payout to allowed claimants. The Trustee further refused to accept any role in the planned litigation by the offeror, and reiterated that based on his investigation and analysis, the alleged Claims had insufficient merit or value to the estate. The Trustee also clarified that the projected substantial distribution to allowed claim holders in this bankruptcy case has no bearing on his conclusions regarding the value of the alleged Claims or his refusal to participate with the offeror in pursuing these parties.

### DISCUSSION

The trustee or debtor in possession has an obligation "to act on behalf of the bankruptcy estate, that is, for the benefit of the creditors." *In re Cybergenics Corp.,* 226 F.3d 237, 243 (3rd Cir. 2000). Along with this obligation, the Chapter 11 trustee owes a a fiduciary duty to *each* creditor of the estate. *Ngan Gung Restaurant v. Foong (In re Ngan Gung Restaurant),* 254 B.R. 566, 570 (Bankr.S.D.N.Y.2000) (citing *Commodity Futures Trading Commission v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986,

85 L.Ed.2d 372 (1985)). The Bankruptcy Code contains several provisions to assist the trustee or debtor in possession in these endeavors. One of the sections of the Bankruptcy Code, § 544(b), grants the trustee or debtor in possession the following authority:

> (b) the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(c) of this title.

Under this section of the Bankruptcy Code, the trustee may utilize certain state-law avoidance actions for the benefit of the estate. This avoidance power has been analogized to "the power of a public official to carry out various responsibilities in a representative capacity." *In re Cybergenics Corp.*, 226 F.3d at 245. The trustee is the only party who is authorized to bring an action under section 544(b) of the Bankruptcy Code until he "abandons it or otherwise allows the creditors to pursue it independently." *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 436 (S.D.N.Y.1993), *aff'd*, 17 F.3d 600 (2nd Cir.1994). It is clear that this special grant of authority is made to the trustee because the trustee is charged with acting in a fiduciary capacity vis-a-vis the creditors of the debtor's estate. By contrast, the offeror made no attempt to investigate during the course of his Chapter 11 case prior to making this present offer to purchase the Trustee's statutory rights. Furthermore, the trustee must answer to the Bankruptcy Court in the event the trustee fails to act in an objectively reasonable manner in carrying out his or her duties. *Ngan Gung Restaurant v. Foong (In re Ngan Gung Restaurant)*, 254 B.R. at 571. Because this grant of authority to bring avoidance actions under the various sections of the Bankruptcy Code is specific to the trustee or debtor in possession, cases entertaining a request for a "transfer" of such right are rare, and are rarely granted:

> Bankruptcy courts are properly hesitant to authorize the sale or assignment of a trustee's avoidance powers or causes of action to a single creditor. Assignments of the Trustee's unique statutory powers, if not narrowly circumscribed, may too easily result in the delegation and dilution of the trustee's duty 'to marshal the debtor's property for the recovery of all property available under state law.'

*In re Greenberg*, 266 B.R. 45 (Bankr. E.D.N.Y.2001).

However, the Court of Appeals for the Second Circuit has had occasion to rule on whether and under what circumstances avoidance actions may be prosecuted by parties other than the acting trustee or the debtor in possession. In the case of *Commodore Intern., Ltd. v. Gould (In re Commodore Intern., Ltd.)*, 262 F.3d 96 (2nd Cir.2001) ("*Commodore*"), the Court of Appeals for the Second Circuit considered whether a creditors' committee could gain standing to prosecute actions against former officers, customers and key suppliers of the debtor. The Second Circuit fashioned a two-part test to determine whether a creditors' committee may obtain standing to prosecute such actions even where the trustee does not unjustifiably refuse to bring suit: where "(1) the committee has the consent of the debtor in possession or the trustee, and (2) the court finds that suit by the committee is (a) in the best interest of the bankruptcy estate, and (b) is 'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings." *Id.* At 100. The Second Circuit noted that this approach resulted in "a reasoned and practicable division of labor between the creditors' committee and the debtor in possession or trustee, while also

providing bankruptcy courts with significant authority to both manage the litigation and to check any potential for abuse by the parties." *Id.*

In the case of *In re Housecraft Industries USA, Inc.*, 310 F.3d 64 (2nd Cir.2002) ("*Housecraft*"), the Court of Appeals for the Second Circuit considered whether to broaden the applicability of the test set forth in the *Commodore* case to include prosecution of avoidance claims by creditors. In the *Housecraft* case, the Chapter 7 trustee and the largest creditor brought an action seeking turnover of the debtor's property as fraudulent transfers. The defendant brought a motion to dismiss the claims for lack of subject matter jurisdiction under 28 U.S.C. Section 1334(b). The trustee moved for retroactive ratification of an agreement between himself and the creditor permitting joint prosecution of the action. Under the terms of the agreement, the trustee and the creditor were to confer on decisions concerning claims to be jointly prosecuted, and the parties recognized that the estate had insufficient funds to prosecute the litigation by itself. *Id.* at 67. In upholding the arrangement, the Bankruptcy Court noted that this was a no-asset case, that the creditor would bear the cost of litigation, and that the suit presented "colorable claims for relief." *Id.* at fn. 4.

The Court of Appeals for the Second Circuit upheld the lower court's decision to approve the arrangement after applying the standards set forth in the *Commodore* case. The Court of Appeals concluded that the participation of the trustee was significant in its decision to approve the arrangement, and also noted that the estate lacked resources to bring the actions on its own. Furthermore, the court found that the actions contemplated had some merit because the court concluded that if the arrangement was not approved, the defendant in question "would have succeeded in evading the bankruptcy laws and benefit[ted] financially at the expense of Housecraft's estate." *Housecraft*, 310 F.3d at 71. The court also noted that approval of the arrangement would prevent the likelihood of future litigation between the estate and the creditor over the applicability of the creditor's security interest in the assets to be recovered. The court concluded as a matter of law that the creditor's interests did not conflict with those of the debtor's estate and for all of the reasons set forth above, the test under *Commodore* could be applied to the creditor's arrangement with the trustee and the factors set forth in *Commodore* had been met.

■■ In the case before the Court, the proposal to permit Joseph Shelley to maintain fraudulent conveyance actions against third parties, which claims the Trustee admits have little or no value, without the Trustee's supervision and participation, does not pass muster. This Court is bound under Second Circuit law to only approve the sale of these claims if 1) the Trustee consents and 2) the court finds that the suits would be a) in the best interest of the bankruptcy estate and b) necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. The Court notes that the Trustee has consented to the sale of the Claims, but the Trustee denies that the proposed avoidance actions have sufficient merit to warrant their commencement and declines to participate with the offeror in any action taken by him. Therefore, the Trustee's consent is deemed to be half-hearted at best. In fact, the Trustee pointedly stated at oral argument that he would not consent to an amendment of the offer to permit the Trustee's participation in the avoidance actions. This leads the Court to conclude that the Trustee consents merely

to the sale of the Claims in order to bring in funds to the estate. There is no "blessing" by the Trustee regarding the Claims, nor is this situation akin to the *Housecraft* case where the trustee had insufficient funds to commence colorable claims against certain parties holding property which belonged to the estate.

Likewise, this Court cannot find that the suits in question are in the best interest of the estate. Joseph Shelley has failed to provide the Court with sufficient evidence to support such a finding. He claims that the parties to be sued received "questionable" transfers from the Debtor, but the Trustee stated on the record that he investigated these alleged improprieties and based on his analysis of the transfers, bringing these suits was not in the best interest of the Debtor's estate. By contrast, the offeror made no attempt to investigate during the course of this Chapter 11 case prior to making this present offer to purchase the Trustee's statutory rights. The Court recognizes that Joseph Shelley is willing to bear all litigation expenses and is willing to increase the cash payment to the Trustee by sharing any recovery with the estate (80% for Joseph Shelley, 20% for the estate), but this is insufficient for the Court to conclude that selling the Claims is in the best interests of the Debtor's estate.

■ The Court has also taken into consideration the fact that the Joseph Shelley Group and the James Shelley Group have been at odds over the Debtor's business for several years, and the animosity between Joseph Shelley and some of the parties he seeks to sue has not abated and may border on a wish to harass the new owners of the business and some of their suppliers. As the Second Circuit has recognized, "in order for any creditor—secured or unsecured—to obtain standing under *Commodore,* the court must find that the creditor's interests in bringing the litigation do not conflict with those of the estate. Thus, as a matter of law, if a . . . creditor's interests conflict with those of the estate, the secured creditor cannot obtain standing under Commodore." *Housecraft,* 310 F.3d at 72 (emphasis added). Given the facts of this case, the Court cannot conclude that the interests of Joseph Shelley in bringing the Claims do not conflict with the estate's interests. Included in the list of Entities are members of the James Shelley Group and Broadway Equities, which is 100% owned by the James Shelley Group. The list also includes Switchboard, which was formed by the James Shelley Group solely for the purchase of the Debtor's assets, as well as current trade creditors of Switchboard. If the outright purchase of the Trustee's statutory rights are allowed, Joseph Shelley will use the Trustee's rights to further his own agenda, and it will not benefit the Debtor's estate.

Because the Court cannot find that the proposed suits are in the best interests of the Debtor's estate, the Court cannot approve the proposed offer by the Trustee to sell the Trustee's statutory rights under the test set forth in *Commodore.* The Court does not find that prosecution of Claims against the purported wrongdoers is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. This is not a case where the Trustee lacks funds to commence the actions in question, and failure to bring the actions will likely result in the loss of a significant benefit to the estate. In the *Housecraft* decision, the Bankruptcy Court for the Southern District of New York had determined that the claims being jointly prosecuted by the creditor and the trustee were colorable, and in fact judgment was entered on the claims in favor of the trustee and the creditor as joint plaintiffs. The

trustee for the debtor stated that he lacked the funds to bring the action, and the Court of Appeals for the Second Circuit recognized that if the creditor had not agreed to jointly prosecute the action with the trustee and to pay for the litigation costs, the defendant would have evaded the bankruptcy laws at the expense of the debtor's estate and its creditors.

If Joseph Shelley is permitted to purchase the Trustee's rights and pursue the alleged wrongdoers, there will be no end in sight to litigation in this case and the only benefit to the estate is the purchase price of $25,000 plus a highly unlikely recovery in the amount of 20% of any recovery by the offeror. The Joseph Shelley Group and the James Shelley Group are highly antagonistic towards each other, and giving Joseph Shelley another avenue to pursue against the James Shelley Group is clearly not necessary and beneficial to the fair and efficient resolution of this bankruptcy estate. It will only delay the conclusion of this case and the case would have to remain open for quite some time if the Application is granted. It is not at all clear that there will that there will be any gain to the estate beyond the initial $25,000 purchase price. Putting an end to litigation in this bankruptcy case and distributing the funds available to creditors is in the best interests of this estate, and this benefit far outweighs any benefit in selling the Trustee's rights.

Despite the binding decisions of *Housecraft* and *Commodore*, which would not permit this Court to sanction the sale of Claims to Joseph Shelley, the Trustee cites to the decision of *In re Greenberg*, 266 B.R. 45 (Bankr.E.D.N.Y.2001) and a Second Memorandum Decision and Order Authorizing the Trustee in that case to make a conditional assignment of claim to the Chubb Group in support of Chubb's Application. The *Greenberg* decisions rendered by Judge Bernstein are factually distinguishable in many ways. The *Greenberg* case was not a Chapter 11 case where the assets and operation of the business were sold to a new operating entity. That case was a Chapter 7 case with no continued operations, and insufficient funds to adequately prosecute the Trustee's avoidance claims. The Chubb Group held more than 99% of the claims against the debtor and had commenced two separate actions prepetition against the debtor's wife seeking to recover alleged fraudulent conveyances made by the debtor. The Chapter 7 trustee made a motion to approve a stipulation of settlement between the trustee and the debtor's wife for $150,000, and the Chubb Group objected. The Chubb group offered to pay the estate $175,000 to purchase the right to continue the fraudulent conveyance actions. After the Chubb Group agreed to pursue the claims on behalf of the estate and agreed to permit the trustee to propose an equitable distribution of recovered assets and to participate in the collection and distribution of any recovered funds, the Bankruptcy Court approved the offer of the Chubb Group. The Chubb Group, as the holder of over 99% of the value of claims in the case, was in a position far different from Joseph Shelley.

Unlike the facts in the *Greenberg* decisions, the offeror does not own more than 99% of the claims in the case. Joseph Shelley has filed claims in this case and the Trustee has filed a motion to expunge the claims, which motion is still pending. Joseph Shelley and the Joseph Shelley Group represent 50% of the equity in the Debtor, and hold a position which is hostile to that of the other 50% of the shareholders of the Debtor. As a result, the Court believes that Joseph Shelley is incapable of acting in a fiduciary capacity on behalf of all creditors of the estate.

## *CONCLUSION*

1.  The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the General Reference of the Court under Rule 4 of the General Rules of the United States District Court for the Eastern District of New York.

2.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(N).

3.  The Court finds that the sale of the Trustee's statutory rights to the offeror without the Trustee's participation and impartial input is not in the best interest of this estate.

4.  The Trustee's statutory rights to commence avoidance actions pursuant to Section 544(b) of the Bankruptcy Code and the enabling statutes cannot be sold or assigned where the only benefit to the estate is the purchase price received for that purchase.

5.  Under the standards enunciated in the *Commodore* and *Housecraft* decisions, the Court denies the Application. An order will be entered simultaneously with this Memorandum Decision.